COURT OF APPEALS OF VIRGINIA


Present:   Chief Judge Fitzpatrick, Judges Benton, Elder, Annunziata, Bumgardner, Frank,
           Humphreys, Clements, Felton and Kelsey
Argued at Richmond, Virginia


CURTIS DARNELL HILLIARD
                                                          OPINION BY
v.        Record No. 0394-02-2                    JUDGE ROBERT J. HUMPHREYS
                                                        AUGUST 31, 2004
COMMONWEALTH OF VIRGINIA


                          UPON A REHEARING EN BANC

                 FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                             Thomas N. Nance, Judge

              Steven D. Benjamin (Betty Layne DesPortes; Benjamin &
              DesPortes, P.C., on briefs), for appellant.

              Steven A. Witmer, Assistant Attorney General (Jerry W. Kilgore,
              Attorney General, on brief), for appellee.


       This matter comes before the Court on a rehearing *en banc* from an unpublished panel

decision of January 6, 2004.  See Hilliard v. Commonwealth, 04 Vap UNP 0394022 (2004).  In

that decision, a divided panel of this Court affirmed Hilliard's convictions for murder (in

violation of Code § 18.2-32), use of a firearm in the commission of murder (in violation of Code

§ 18.2-53.1), maliciously shooting into an occupied vehicle (in violation of Code § 18.2-154),

and discharging a firearm on or within 1000 feet of school property (in violation of Code

§ 18.2-280(B)), finding that the trial court properly denied Hilliard's motion to suppress

inculpatory statements obtained from him by the police after he allegedly invoked his right to an

attorney and that it did not err in giving an Allen charge to the jury during the guilt phase of the

trial or in its response to questions from the jury during the sentencing phase of the trial on the

presumption of consecutive sentences and the possibility of geriatric release.  By order dated

February 10, 2004, we granted the appellant's petition for a rehearing *en banc*, stayed the mandate of that decision, and reinstated the appeal. Upon rehearing this case *en banc*, we affirm in part and reverse in part and remand.

## I. Background

In reviewing a trial court's denial of a motion to suppress, we consider the evidence in the light most favorable to the Commonwealth, granting to the Commonwealth all reasonable inferences fairly deducible from the evidence. See Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991).

On July 7, 1999, the victim, Anthony Robinson, Jr., was shot and killed in Richmond, Virginia. Hilliard was indicted for Robinson's murder on September 13, 1999, and arrested on September 15, 1999. Richmond City Police Detectives White and Kochell interviewed him the next day.

At the beginning of the interview, Detective Kochell advised Hilliard of his rights under Miranda v. Arizona, 384 U.S. 436, 469-73 (1966), and asked him to sign a waiver form indicating he understood his rights and wished to speak to the detectives. Before signing the form, Hilliard asked the detectives, "Can I have somebody else present too, I mean just for my safety, like a lawyer, like y'all just said, or something? Can I . . .?" Detective White responded, "That's up to you. Like [Detective Kochell] said, all we're doing today is just trying to get your side of the story. That's all we're trying to do." Hilliard replied, "But I'm trying to tell you, I don't have a side. I don't." Detective White then explained to Hilliard that they could not continue to speak with him unless he signed the form. Hilliard signed the waiver form, and the detectives continued the interview.

Moments later, after being asked how he knew the victim and being told by the detectives to be "honest," Hilliard stated:

I understand what both of you all are saying wholeheartedly. I need to say that . . . I'm not saying that I know anything. I'm not saying that I know the person. You know what I'm saying? The only thing, . . . like I said, *I would like to have somebody else in here because I may say something I don't even know what I am saying*, and it might fuck me up, might jam me up in some incidents, and I don't want that to happen, man.

(Emphasis added.) Detective Kochell replied, "We're not here trying to jam you up. Okay?" Kochell then explained to Hilliard that the interview was not going to be conducted in a harsh manner, like those seen on television. Hilliard then continued his conversation with the detectives.

Approximately an hour into the interview, Detective White told Hilliard he wanted to know "what happened and why" and wanted Hilliard to tell his "side of the story." The following exchange then occurred:

> HILLIARD: Can I get a lawyer in here?
>
> DETECTIVE WHITE: Do you want to do that?
>
> HILLIARD: I already have a lawyer. I mean, I can talk to you, don't get me wrong. But I just want to make sure I don't, like I said before, just jam myself up. And I'll tell you everything that I know. This is my word.
>
> DETECTIVE WHITE: Okay. That's fine.
>
> DETECTIVE KOCHELL: That's fine.
>
> HILLIARD: I'm not saying that I will say anything other or just because he's in here. I just want to, you know, make sure I have . . . I'd feel a little bit more comfortable.
>
> DETECTIVE KOCHELL: That's not a problem. We tried to provide you with a comfortable atmosphere here. And, like I said, it's not the stuff that you see on TV dealing with Sipowicz, okay, where he takes a guy and throws him up on the wall. That's not what we're about.
>
> HILLIARD: I will say, I will go as far as to say this. Probably what you all got in that book ain't nowhere near.
>
> DETECTIVE WHITE: I'm not with you.

HILLIARD:  I'm just saying, what you all probably have in that book, I doubt that it's anywhere near it.

DETECTIVE WHITE:  Anywhere near . . . of what we know of why it happened?

HILLIARD:  Yeah.

DETECTIVE WHITE:  Well, that's why we want to hear from you, because we know there's a bigger picture there.  Okay?  You know what the problem is, [Hilliard], is that you got caught up in it.

HILLIARD:  Yeah, I did.  I was there.  I'm going to just say that, I was there.  But before I say anything else, I mean, I already talked to you before we go to court.

A few moments later, Detective White told Hilliard:

And like you said, we've got plenty of time to sit down and talk like this again with your attorney here, okay, because that's what you've expressed.  And you've told us that you were there and there's a bigger picture that you'd like to go over it with your attorney and then explain it to us, okay, and that's where we'll leave it.

The interview ended shortly thereafter.

Prior to his trial on the charges at issue, Hilliard filed a motion to suppress alleging that police obtained the statement he provided during the September 16, 1999 interview, in violation of his "fourth, fifth and sixth Amendment [rights]" "and/or" in violation of his rights under "Article 1, Section 8, 10, or 11 of the Constitution of Virginia and Section 19.2-59 of the Code of Virginia."  The videotape of that interview was the sole evidence presented during the hearing on Hilliard's motion.

Based upon that evidence, Hilliard argued he made three requests for the assistance of an attorney, but the police ignored each request and continued the interrogation.  The trial court denied the motion to suppress, finding that Hilliard's questions and statements referencing an attorney were "equivocated" and that, "even if he invoked his right to a lawyer immediately prior

to the statement," Hilliard's admission that he was at the scene of the crime "was purely voluntary, was not as the result of any continuing interrogation or response to a question."

Hilliard was tried on February 29, 2000 and March 1, 2000. During jury deliberations, at the end of the first day, the jury foreperson sent a note to the trial judge saying, "We are split 10-2. We can't reach a unanimous decision." The trial judge released the jurors until the following day and told the attorneys to "decide in the meantime if you want me to give them the Allen charge."

The next morning, the trial judge asked the attorneys, "Have you all discussed whether or not you want to give them the Allen charge or just continue?" Hilliard's counsel told the trial judge he did not want the court to give the Allen charge. The trial judge responded, "I will just tell them to start again, reread the evidence, don't speculate; go over the evidence and talk to each other." Neither party objected to the trial court's suggestion. Thereafter, the jury returned to the courtroom and the trial judge made the following remarks to the jury:

> Good morning. Seems like we just left. You know, we all know what kind of job you all are assigned here, and it's a very difficult thing. We can't go out and get twelve better people to do this job than you all; you can do this job. You have a duty to listen to each other and you have a duty to follow the law and not speculate. But what I want you to do is to go back, try to start fresh with the instructions, take your time, go through these things and the facts and talk to each other about it. You can reach a decision in this case. So you all go back and take your time. I think they will get you some coffee and if you need a Coke or something — whatever you need, let them know; they will be glad to accommodate you. Thank you. Continue your deliberations.

Hilliard made no objection to the trial court's remarks. The jury subsequently found Hilliard guilty of murder, use of a firearm in the commission of murder, maliciously shooting into an occupied vehicle and discharging a firearm on/near school property.[1]

After the jury returned its verdicts, the trial court prepared to instruct the jury with respect to sentencing. The trial court asked Hilliard, "Do you want anything about parole in Virginia or not?" Initially, Hilliard's counsel stated, "I think you should say there is no parole." However, after further discussion with the trial judge and consultation with Hilliard, Hilliard's counsel decided not to ask for an instruction regarding parole.

During its sentencing deliberations, the jury submitted three written questions to the trial court:

> 1. Do the sentences run concurrently?
>
> 2. Will he get credit for times [sic] served?
>
> 3. When will he be eligible for parole?

In the ensuing discussion about how to respond to the jury's questions, Hilliard's counsel asked the trial court to tell the jury "there is no parole" and that the sentences would "run consecutively." The trial court responded: "It may not run consecutive. It could run concurrent. That's not for them to decide and credit for time served. I don't mind telling them he gets credit for time served. I don't mind telling them as far as they're concerned, there is personally no parole." Hilliard made no objection to the court's decision. Instead, his counsel asked, "Just the parole issue?" to which the trial court responded, "All right. Bring [the jury] back."

---

[1] In a separate proceeding, Hilliard pled guilty, pursuant to <u>North Carolina v. Alford</u>, 400 U.S. 25 (1970), to the charge of possession of a firearm after having been convicted of a felony. Neither that conviction, nor the resulting sentence, is at issue in this appeal.

Before the jury returned, however, the Commonwealth sought further clarification of how the trial court was intending to respond to the jury's questions. In reply to the Commonwealth's query, the trial court stated:

> Well, they say when will he be eligible for parole and that sort of bothers me because he may be eligible when he's seventy or when he's sixty, or whatever it is, and then you get into that's not a true — as far as a jury is concerned, there is no parole in Virginia. But in this situation, they want to know when he will be eligible.

The Commonwealth then asked the trial court not to answer the parole question. Hilliard's counsel again asked that the jury be instructed, "that there is no parole." The trial court then instructed the jury as follows:

> Ms. Bowles I got your question and I have talked it over with the lawyers and pretty generally, it's — I am to explain to you that your function at this time is to listen, take the evidence and the law and what you've heard and decide on a proper punishment in each of these cases. That's what you do. You're not to concern yourself with what may happen afterward. You set an appropriate punishment in each of these cases. That's your job. I will tell you that other than some exceptional circumstances, parole in Virginia was abolished several years ago and that's all I'm allowed to tell you.

Hilliard did not object to the instruction given. The jury ultimately recommended that Hilliard be sentenced to serve 40 years for murder, 3 years for use of a firearm in the commission of murder, 10 years for shooting into an occupied vehicle, and 10 years for discharging a firearm within 1000 feet of school property.

At Hilliard's sentencing on April 21, 2000, Hilliard made a motion to set aside the verdict on the basis that the trial court improperly advised the jury during its deliberations in the guilt phase of his trial. Specifically, Hilliard argued that, although the trial court's statement to the jury was "not the same as the Allen charge, . . . it [was] very similar, and that this comment by the Court improperly interfered with the jury's deliberation." The trial court denied the motion. This appeal followed.

II.  Analysis

A.

On appeal, Hilliard first contends that the trial court erred in denying his motion to suppress evidence because police violated his right to counsel as embodied in the Fifth and Fourteenth Amendments to the United States Constitution.  Because we find that the police violated Hilliard's <u>Miranda</u> right to counsel by continuing to interrogate him after he clearly and unequivocally invoked his right to counsel, we reverse and remand.

We begin by recognizing that, on an appeal of a ruling on a motion to suppress, "we are bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them," <u>McGee v. Commonwealth</u>, 25 Va. App. 193, 198, 487 S.E.2d 259, 261 (1997) (*en banc*), but we review *de novo* the trial court's application of defined legal standards such as probable cause and reasonable suspicion to the particular facts of the case, <u>Ornelas v. United States</u>, 517 U.S. 690, 699 (1996).

An accused who is "subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning."  <u>Davis v. United States</u>, 512 U.S. 452, 457 (1994) (citing <u>Miranda</u>, 384 U.S. at 469-73); <u>see also</u> <u>United States v. Pantane</u>, ___ U.S. ___ (2004) ("[T]he <u>Miranda</u> rule is a prophylactic employed to protect against violations of the Self-Incrimination Clause.").  "[T]he police must explain this right to [the accused] before questioning begins."  <u>Davis</u>, 512 U.S. at 457.  If the accused "effectively waives his right to counsel after receiving the <u>Miranda</u> warnings, law enforcement officers are free to question him."  <u>Id.</u> at 458.  However, if the accused "requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation."  <u>Id.</u>

"[T]he test for determining whether the accused invoked the right to counsel is an objective one." McDaniel v. Commonwealth, 30 Va. App. 602, 605, 518 S.E.2d 851, 853 (1999) (*en banc*). "The Court must determine whether the accused 'articulated his desire to have counsel present *sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney*.'" Id. (quoting Davis, 512 U.S. at 459) (emphasis added). Only if the accused "clearly request[ed] an attorney" would the interviewing officers be required to stop questioning him. Davis, 512 U.S. at 461.

An issue of whether an accused "clearly requested an attorney during a custodial interrogation is a mixed question of law and fact." Commonwealth v. Redmond, 264 Va. 321, 326, 568 S.E.2d 695, 697 (2002) (plurality opinion). "'[T]he determination of what [the accused] actually said is a question of fact that we review only for clear error. . . . Whether those words are sufficient to invoke the right to counsel is a legal determination that we review *de novo*.'" Id. at 327, 568 S.E.2d at 698 (quoting United States v. Uribe-Galindo, 990 F.2d 522, 523 (10th Cir. 1993) (other citation omitted)).

As the United States Supreme Court explained in Davis:

> Invocation of the Miranda right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." McNeil v. Wisconsin, 501 U.S. [171,] 178 [(1991)]. But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning.

512 U.S. at 459. The Supreme Court further explained in Davis that "when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether he actually wants an attorney." Id. at 461. The Court added, however: "But we decline to adopt a rule requiring officers to ask clarifying questions. If the

suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." Id. at 461-62.

A statement, however, "either is such an assertion [of the right to counsel] or it is not. Where nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease. In these circumstances, an accused's subsequent statements are relevant only to the question whether the accused waived the right he had invoked." Smith v. Illinois, 469 U.S. 91, 97-98 (1984) (internal quotation omitted).

In Davis, the suspect, after waiving his right to counsel, was interviewed by investigators regarding his involvement in a murder. During the interview, the suspect stated, "Maybe I should talk to a lawyer." 512 U.S. at 455. The investigators did not stop the interview at that point. Id. The United States Supreme Court held that the suspect's statement "was not a request for counsel." Id. at 462.

Similarly, in Redmond, the accused, after waiving his Miranda right to counsel, was questioned by the police regarding the circumstances of a murder for which he had been arrested. 264 Va. at 324-25, 568 S.E.2d at 696-97. During the interrogation, the accused asked, "Can I speak to my lawyer? I can't even talk to [a] lawyer before I make any kinds of comments or anything?" Id. at 325, 568 S.E.2d at 697. The officers conducting the interrogation did not discontinue their questioning of the accused at that point. Id. In concluding that the accused "failed to make a clear and unambiguous assertion of his right to counsel," id. at 330, 568 S.E.2d at 700, the Court stated as follows:

> Prior to the Supreme Court's decision in Davis, this Court
> consistently held that a clear and unambiguous assertion of the
> right to counsel is necessary to invoke the rule [requiring the police
> to cease an interrogation when the accused requests counsel]. See
> Mueller v. Commonwealth, 244 Va. 386, 396, 422 S.E.2d 380, 387
> (1992) (defendant's question "Do you think I need an attorney
> here?" not a clear assertion of right to counsel), cert. denied, 507
> U.S. 1043 (1993); Eaton v. Commonwealth, 240 Va. 236, 250,

252-54, 397 S.E.2d 385, 393, 395-96 (1990) (defendant's question "You did say I could have an attorney if I wanted one?" not a clear assertion of right to an attorney), cert. denied, 502 U.S. 824 (1991); Poyner v. Commonwealth, 229 Va. 401, 410, 329 S.E.2d 815, 823 (defendant's question "Didn't you say I have the right to an attorney?" not a clear assertion of right to counsel), cert. denied, 474 U.S. 865 (1985).  And, this Court applied Davis in Midkiff v. Commonwealth, 250 Va. 262, 266-67, 462 S.E.2d 112, 115 (1995) (defendant's statement "I'll be honest with you, I'm scared to say anything without talking to a lawyer" not a clear assertion of right to counsel).

Id. at 329-30, 568 S.E.2d at 699-700.  In that case, however, the Court noted, after having reviewed a videotape of the interrogation contained in the record, that "the historical facts such as the context of the defendant's questions, the tone of his voice, his voice inflections, and his demeanor support[ed] the conclusion that this defendant did not make a clear assertion of his right to counsel.  At best, the defendant's questions may be construed as a desire on his part to obtain more information about his Miranda rights."  Id. at 330, 568 S.E.2d at 700.

In contrast, in McDaniel, we held that the accused's response after being advised of his Miranda rights, "I think I would rather have an attorney here to speak for me," was an unequivocal request for counsel.  30 Va. App. at 606, 518 S.E.2d at 853.  Despite the accused's use of the words "think" and "rather," we found that the accused "made his choice clear, informing the detective that he desired to have an attorney speak for him."  Id.

In the case at bar, Hilliard contends that he made three requests for the assistance of counsel during the September 16, 1999 interrogation and that each of those requests equated to a clear, unequivocal request for counsel.  Applying the above-stated principles to the facts and circumstances of this case, and after reviewing the videotape of his interrogation that was admitted as an exhibit in this case, we conclude that Hilliard's first two "requests" did not express a clear and unequivocal desire for counsel, but that his final "request" constituted an

unequivocal invocation of his right to counsel, requiring police to immediately cease the interrogation.

In the first instance, after being advised of his <u>Miranda</u> rights, Hilliard asked, "Can I have somebody else present too, I mean just for my safety, like a lawyer, like you all just said, or something? Can I . . .?" Uncertain about Hilliard's response, one of the detectives replied, "That's up to you." When told by the detectives that they could not talk to him unless he signed the waiver form, Hilliard signed the form, agreeing to speak to the detectives without a lawyer being present. Thus, Hilliard's question was, at most, an inquiry designed to elicit clarification from the detectives regarding the rights he had just been read, not an unequivocal request for an attorney. See <u>Redmond</u>, 264 Va. at 330, 568 S.E.2d at 700.[2]

Shortly thereafter, Hilliard stated, "[L]ike I said, I would like to have *somebody else* in here because I may say something I don't even know what I am saying, and it might . . . jam me up . . . ." (Emphasis added.) Although Hilliard's statement "expresses his reservation about the wisdom of continuing the interrogation without" *someone* there to assist him, "it does not clearly and unambiguously communicate a desire to invoke his right to counsel." <u>Midkiff</u>, 250 Va. at 267, 462 S.E.2d at 115. Thus, it was not a clear request for counsel.

However, approximately one hour later, Hilliard asked, "Can I get a lawyer in here?" Detective White then asked Hilliard the clarifying question, "Do you want to do that?" Hilliard responded, "I already have a lawyer. I mean, I can talk to you, don't get me wrong. But I just want to make sure I don't, like I said before, just jam myself up. And I'll tell you everything that I know. This is my word." We find Hilliard's statements in this regard, when considered in their context, constituted a clear and unequivocal request for counsel.

---

[2] Hilliard does not argue on appeal that his waiver was made without the requisite knowledge and intelligence, nor that it was made involuntarily. Accordingly, we do not address those issues in this opinion.

Like the Supreme Court of Virginia in Redmond, we have "independent[ly] review[ed]" the videotape of Hilliard's custodial interrogation and we have given "due weight to the inferences drawn from the historical facts therein." Redmond, 264 Va. at 330, 568 S.E.2d at 700. From that examination, we conclude that Hilliard's statements could only be understood by reasonable officers, under the circumstances at issue in this case, as an unambiguous assertion of his right to counsel. "[T]he historical facts such as the context," id., of Hilliard's question, "the circumstances leading up to the request," Smith, 469 U.S. at 97-98, "the tone of his voice, his voice inflections, and his demeanor," in totality, support the reasonable conclusion that Hilliard clearly requested the presence of counsel before police proceeded further with the interrogation, Redmond, 264 Va. at 330, 568 S.E.2d at 700. See also Davis, 512 U.S. at 459 (noting "a suspect need not 'speak with the discrimination of an Oxford don'"); State v. Dumas, 750 A.2d 420, 425 (R.I. 2000) ("We believe that the statement, 'Can I get a lawyer?' *could be sufficiently clear in some circumstances* to meet this standard. In normal parlance, this syntactic phraseology is an acceptable and reasonable way to frame a request. A suspect asserting his or her right to counsel need not speak with perfect formality, but may use any manner of colloquial speech, so long as his or her statement would be reasonably understood as a request for an attorney." (emphasis added) (footnote omitted)).[3] For these reasons, we reverse the trial court's denial of Hilliard's motion to suppress to the extent that it held Hilliard's final "request" for counsel was "equivocated."

---

[3] In fact, although not dispositive to our analysis, the officers here clearly *subjectively* understood Hilliard's statements to be more than simply a "desire on his part to obtain more information about his Miranda rights." Redmond, 264 Va. at 330, 568 S.E.2d at 700. Indeed, the officers responded, "Okay. That's fine." And, after a brief discussion, the officers terminated the interrogation, stating "like you said, we've got plenty of time to sit down and talk like this again with your attorney here, okay, *because that's what you've expressed*." (Emphasis added.)

Our analysis, however, does not end there.  We note that, after the officers acknowledged Hilliard's invocation of his right to counsel, the following exchange occurred:

> DETECTIVE WHITE:  Okay.  That's fine.
>
> DETECTIVE KOCHELL:  That's fine.
>
> HILLIARD:  I'm not saying that I will say anything other or just because he's in here.  I just want to, you know, make sure I have . . . I'd feel a little bit more comfortable.
>
> DETECTIVE KOCHELL:  That's not a problem.  We tried to provide you with a comfortable atmosphere here.  And, like I said, it's not the stuff that you see on TV dealing with Sipowicz, okay, where he takes a guy and throws him up on the wall.  That's not what we're about.
>
> HILLIARD:  I will say, I will go as far as to say this.  Probably what you all got in that book ain't nowhere near.

While it is true that, pursuant to Miranda, "if the suspect requests counsel at any time during the interrogation, the interrogation must cease until an attorney has been made available to the suspect or the suspect reinitiates the interrogation," id. at 328, 568 S.E.2d at 698 (citing Edwards, 451 U.S. at 484-85), we recognized in Blain v. Commonwealth, 7 Va. App. 10, 15, 371 S.E.2d 838, 841 (1988), that:

> [I]nterrogation includes . . . express questioning [and] its "functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 301 (1980).  The [United States Supreme] Court defined the "functional equivalent" of questioning as "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id.  If a suspect's statement was not foreseeable, then it is volunteered.  "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by [Miranda]." Miranda, 384 U.S. at 478.  We interpret the Innis standard as requiring a determination whether an objective observer would view an officer's words or actions as designed to elicit an incriminating response.

The record establishes that neither Detective Kochell nor Detective White asked Hilliard any questions after he invoked his right to counsel and before he stated:  "I will say, I will go as

far as to say this.  Probably what you all got in that book ain't nowhere near."  Moreover, it can hardly be argued that Detective Kochell's statements about the "comfortable atmosphere" and the fictional television police officer were words that an objective observer would view as "reasonably likely to elicit an incriminating response" from Hilliard.  It is thus clear that Hilliard's statement in that regard was a "volunteered statement" and, therefore, its admissibility is not affected by <u>Miranda</u>, <u>Edwards</u>, or any invocation of Hilliard's right to counsel.  Consequently, we affirm the trial court's denial of Hilliard's motion to suppress as to this particular statement.

Nonetheless, the discussion between police and Hilliard continued as follows:

> DETECTIVE WHITE:  I'm not with you.
>
> HILLIARD:  I'm just saying, what you all probably have in that book, I doubt that it's anywhere near it.
>
> DETECTIVE WHITE:  Anywhere near . . . of what we know of why it happened?
>
> HILLIARD:  Yeah.
>
> DETECTIVE WHITE:  Well, that's why we want to hear from you, because we know there's a bigger picture there.  Okay?  You know what the problem is, [Hilliard], is that you got caught up in it.
>
> HILLIARD:  Yeah, I did.  I was there.  I'm going to just say that, I was there.  But before I say anything else, I mean, I already talked to you before we go to court.

Clearly, Hilliard's statement about his presence at the scene of the crime was produced as a result of express questioning by the officers.  As stated above, that questioning should have ceased immediately after it became clear to the officers that Hilliard invoked his right to counsel.  Thus, the trial court should have suppressed Hilliard's statement in that regard.  Because the trial court found that statement "could be inculpatory, and . . . a declaration against [Hilliard's]

interest," we reverse Hilliard's convictions on this ground and remand this matter for further proceedings if the Commonwealth is so inclined.

B.

Hilliard next contends the police officers also violated his Sixth Amendment right to counsel, because the September 16, 1999 interrogation occurred "post-indictment."

> The Sixth Amendment right to counsel is triggered "at or after the time that judicial proceedings have been initiated . . . 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" Brewer v. Williams, 430 U.S. 387, 398 (1977) (quoting Kirby v. Illinois, 406 U.S. 682, 689 (1972)). We have held that an accused is denied "the basic protections" of the Sixth Amendment "when there [is] used against him at his trial evidence of his own incriminating words, which [police] . . . deliberately elicited from him after he had been indicted and in the absence of his counsel." Massiah v. United States, 377 U.S. 201, 206 (1964); cf. Patterson v. Illinois, [487 U.S. 285 (1988)] (holding that the Sixth Amendment does not bar postindictment [sic] questioning in the absence of counsel if a defendant waives the right to counsel).

Fellers v. United States, 540 U.S. ___, ___ (2004). However, the Commonwealth contends that Hilliard's contention in this regard was not properly preserved pursuant to Rule 5A:18. We agree.

It is well-settled that "No ruling of the trial court . . . will be considered as a basis for reversal unless the objection was stated together with the grounds therefor at the time of the ruling, except for good cause shown or to enable the Court of Appeals to attain the ends of justice." Rule 5A:18.

> The main purpose of requiring timely specific objections is to afford the trial court an opportunity to rule intelligently on the issues presented, thus avoiding unnecessary appeals and reversals. In addition, a specific, contemporaneous objection gives the opposing party the opportunity to meet the objection at that stage of the proceeding.

Weidman v. Babcock, 241 Va. 40, 44, 400 S.E.2d 164, 167 (1991) (citation omitted). Thus, the Court of Appeals will not consider an argument on appeal that was not presented to the trial court. See Ohree v. Commonwealth, 26 Va. App. 299, 308, 494 S.E.2d 484, 488 (1998). That rule applies to constitutional claims, as well as non-constitutional claims. Id.

While we recognize that Hilliard made a bare reference to the Sixth Amendment in his broadly-written motion to suppress, we would be remiss if we did not likewise acknowledge that Hilliard's counsel made not a single reference to the Sixth Amendment during the hearing on his motion to suppress. In fact, Hilliard's counsel did not mention that police spoke with Hilliard "post-indictment," nor did he remotely contend that police deliberately or designedly elicited information from him after he had been indicted and in the absence of his counsel. See Fellers, 540 U.S. at ___.

As indicated above, the contemporaneous objection rule - Rule 5A:18 - "requires . . . that a party inform the trial court of the action it wishes the court to take or its objection to the action of the court and the 'grounds therefor.'" Lash v. County of Henrico, 14 Va. App. 926, 929, 421 S.E.2d 851, 852 (1992) (quoting Code § 8.01-384). While the rule does not prohibit reliance on statutes or cases not presented to the trial court, it does require that any position on appeal be "adequately presented" below. Id. at 929, 421 S.E.2d at 853. That did not occur here. In fact, because Hilliard's counsel did not raise the issue of the Sixth Amendment during the suppression hearing, the Commonwealth had no opportunity to respond and the trial court had no opportunity to render a ruling on that issue. Thus, we find that Hilliard is now barred from raising that issue for the first time on appeal. Rule 5A:18. Moreover, because Hilliard has not argued on appeal that any exception to Rule 5A:18 would apply to the circumstances presented in this case, we do not address the issue further.

C.

For the reasons stated above, we affirm the trial court's denial of Hilliard's motion to suppress as it relates to any statements Hilliard made to police prior to what we have here determined to be his unequivocal request for counsel. We further affirm the trial court's decision not to suppress his volunteered statement, but find that the trial court erred in denying the motion as it related to any statements he made thereafter. As we have found those statements to be inculpatory, we reverse Hilliard's convictions for murder (in violation of Code § 18.2-32), use of a firearm in the commission of murder (in violation of Code § 18.2-53.1), maliciously shooting into an occupied vehicle (in violation of Code § 18.2-154), and discharging a firearm on or within 1000 feet of school property (in violation of Code § 18.2-280(B)), and remand this matter for further proceedings if the Commonwealth is so inclined. Further, in light of our holding in this regard, we find no reason to address Hilliard's remaining contentions.

Affirmed, in part, and
reversed, in part,
and remanded.

Benton, J., with whom Fitzpatrick, C.J., joins, concurring, in part, dissenting, in part, and concurring in the judgment reversing the convictions.

I agree with the majority opinion that the trial judge erred in denying the motion to suppress. I believe, however, that each of Curtis Darnell Hilliard's three assertions were unequivocal requests for an attorney, and, therefore, I would hold that any statements he made after his first request for an attorney should be suppressed.

I.

Under the standard announced by the Supreme Court, Hilliard asserted his Fifth Amendment right to counsel.

> Courts [are required] to "determine whether the accused actually invoked his right to counsel." To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry. Invocation of the Miranda right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning.
>
> Rather, the suspect must unambiguously request counsel. As we have observed, "a statement either is such an assertion of the right to counsel or it is not." Although a suspect need not "speak with the discrimination of an Oxford don," he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.

Davis v. United States, 512 U.S. 452, 458-59 (1994) (citations omitted).

The detectives began the interrogation by telling Hilliard they were there to "get some things straight" and to "hear what [Hilliard] had to say." After a detective told Hilliard he had to read a form to him that must be read to every person before an interview, he read the Miranda warnings to Hilliard. He asked Hilliard to sign the form acknowledging that the warnings were read to him and then sign again indicating the detectives could talk to him. Before Hilliard

signed the form, he made the first of three requests for a lawyer. Hilliard said, "Can I have somebody else present too, I mean just for my safety, like a lawyer like y'all just said?" One of the detectives responded that they were just trying to get his side of the story and said they could talk after he signed the form. When Hilliard signed the form, the detectives continued the interrogation. Hilliard then said, "Like I said, I would like to have somebody else in here." The interrogation continued.

During lengthy dialogues, the detectives told Hilliard that more than two people identified him as the killer and said they had sufficient evidence to convict him but wanted to know his side of the story. Hilliard denied being involved in the killing. As the detectives showed him a diagram of the location of the murder and continued to interrogate him, Hilliard said, "Can I get a lawyer in here?" Although Hilliard expressed discomfort with continuing the interrogation without assistance, the detectives failed to honor his requests.

Hilliard's statements were "appropriate responses to the warnings, which gave [him] the choice of speaking with the detective without an attorney or having an attorney present while the detective questioned him." McDaniel v. Commonwealth, 30 Va. App. 602, 606, 518 S.E.2d 851, 853 (1999). To deny that each of Hilliard's three "'statements . . . can reasonably be construed to be an expression of a desire for the assistance of an attorney,'" Davis, 512 U.S. at 459, is to disadvantage Hilliard because of his lack of linguistic skills and to impose upon him the very requirement that the Supreme Court has expressly rejected -- that he "need not 'speak with the discrimination of an Oxford don.'" Id. (citation omitted). Under the circumstances, Hilliard "articulate[d] his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand [each of ] the statement[s] to be a request for an attorney." Id. Thus, the trial judge erred in failing to suppress the statements, all of which were obtained in violation of Hilliard's Fifth Amendment rights.

II.

In his motion to suppress, Hilliard alleged that "evidence was obtained during that interview . . . in violation of the fourth, fifth and sixth amendments of the Constitution of the United States." I would hold that this motion was sufficient to apprise the trial judge of the action Hilliard desired the judge to take and the legal basis for the motion. See Code § 8.01-384 (providing that "[n]o party, after having made an objection or motion known to the court, shall be required to make such objection or motion again in order to preserve his right to appeal"). I would also hold, therefore, that Rule 5A:18 does not preclude this Court from considering Hilliard's claim of a Sixth Amendment violation.

Recently, the United States Supreme Court addressed this precise Sixth Amendment protection.

> The Sixth Amendment right to counsel is triggered "at or after the time that judicial proceedings have been initiated . . . 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" Brewer v. Williams, 430 U.S. 387, 398 (1977) (quoting Kirby v. Illinois, 406 U.S. 682, 689 (1972)). We have held that an accused is denied "the basic protections" of the Sixth Amendment "when there [is] used against him at his trial evidence of his own incriminating words, which federal agents . . . deliberately elicited from him after he had been indicted and in the absence of his counsel." Massiah v. United States, 377 U.S. 201, 206 (1964); cf. Patterson v. Illinois, supra (holding that the Sixth Amendment does not bar postindictment questioning in the absence of counsel if a defendant waives the right to counsel).

Fellers v. United States, 540 U.S ___, ___ (2004).

Under the circumstances I have addressed above, the record clearly established that the officers interrogated Hilliard post-indictment and ignored his invocation of his right to an attorney. Indeed, Hilliard told the detectives: "I already have a lawyer. I would feel more comfortable with him here." Yet, the interrogation continued in violation of the Sixth

Amendment.  I would hold, therefore, that the trial judge erred in failing to suppress the statements.

III.

For these reasons, I would hold that the trial judge erred in denying the motion to suppress the incriminating statements, and I would reverse the convictions and remand for a new trial.

Clements, J., with whom Bumgardner, Felton and Kelsey, JJ., join, concurring, in part, and dissenting, in part.

I join with that portion of Judge Humphreys's opinion holding that, having failed to properly preserve his claim that his Sixth Amendment right to counsel was violated, Hilliard is barred from raising that issue for the first time on appeal. I further concur with Judge Humphreys's decision that neither of Hilliard's first two purported requests for an attorney during the custodial interrogation constituted a clear invocation of the <u>Miranda</u> right to counsel. However, I disagree with Judge Humphreys and Judge Benton's view that Hilliard's third "request" was a "clear and unequivocal request for counsel," requiring the cessation of the interrogation and the suppression of Hilliard's subsequent inculpatory statements. Hence, I respectfully dissent from the majority's decision that the trial court erred in denying Hilliard's motion to suppress his inculpatory statements to police, and, for the reasons that follow, I would affirm Hilliard's convictions.

## I. MOTION TO SUPPRESS

Hilliard contends, on appeal, that he made three requests for an attorney during the September 16, 1999 custodial interrogation by police. He argues that his clear invocation of his <u>Miranda</u> right to counsel required the immediate cessation of the interrogation and the suppression of the incriminating statements he thereafter gave to police when the interrogation was not terminated. Finding that Hilliard's purported requests for counsel were not clear and unequivocal invocations of his <u>Miranda</u> right to counsel, I would hold that the trial court did not err in denying the motion to suppress.

It is well settled that "law enforcement officers must immediately cease questioning a suspect who has clearly asserted his right to have counsel present during custodial interrogation." <u>Davis v. United States</u>, 512 U.S. 452, 454 (1994) (citing <u>Edwards v. Arizona</u>, 451 U.S. 477 (1981)). In <u>Davis</u>, the Supreme Court held that, "[t]o avoid difficulties of proof and to provide guidance to officers conducting interrogations," the determination whether an accused invoked

the Miranda right to counsel is "an objective inquiry." Id. at 458-59. The Supreme Court also held, in Davis, that, to invoke the Miranda right to counsel, "[t]he suspect must unambiguously request counsel." Id. at 459. The suspect's reference to counsel "'either is such an assertion of the right to counsel or it is not.'" Id. (quoting Smith v. Illinois, 469 U.S. 91, 97-98 (1984) (per curiam) (brackets and internal quotation marks omitted)). The Supreme Court explained that, "[a]lthough a suspect need not 'speak with the discrimination of an Oxford don,' he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Id. (quoting id. at 476 (Souter, J., concurring in judgment)). Thus, the Court explained further, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," the interrogation need not be ceased. Id. at 459. In other words, "after a knowing and voluntary waiver of the Miranda rights, law enforcement officers may continue questioning until and unless the suspect clearly[, unambiguously, and unequivocally] requests an attorney." Id. at 461. To require otherwise, the Court noted, "'would transform the Miranda safeguards into wholly irrational obstacles to legitimate police investigative activity.'" Id. at 460 (quoting Michigan v. Mosley, 423 U.S. 96, 102 (1975)).

Aware that its rule requiring suspects wanting assistance of counsel to clearly, unambiguously, and unequivocally invoke the Miranda right to counsel was not without its drawbacks, the Supreme Court further noted, in Davis, as follows:

> We recognize that requiring a clear assertion of the right to counsel might disadvantage some suspects who—because of fear, intimidation, lack of linguistic skills, or a variety of other reasons—will not clearly articulate their right to counsel although they actually want to have a lawyer present. But the primary protection afforded suspects subject to custodial interrogation is the Miranda warnings themselves. "Full comprehension of the rights to remain silent and request an attorney [is] sufficient to

> dispel whatever coercion is inherent in the interrogation process." A suspect who knowingly and voluntarily waives his right to counsel after having that right explained to him has indicated his willingness to deal with the police unassisted. Although Edwards provides an additional protection—if a suspect subsequently requests an attorney, questioning must cease—it is one that must be affirmatively invoked by the suspect.

Id. at 460-61 (quoting Moran v. Burbine, 475 U.S. 412, 427 (1986)).

The Supreme Court also noted that,

> when a suspect makes an ambiguous or equivocal statement[,] it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney. . . . Clarifying questions help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel. But we decline to adopt a rule requiring officers to ask clarifying questions. If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him.

Id. at 461-62.

The Supreme Court concluded, in Davis, that the appellant's statement during the custodial interrogation, "Maybe I should talk to a lawyer," did not constitute a clear, unambiguous, and unequivocal request for an attorney and, hence, "was not a request for counsel" requiring cessation of the interrogation or suppression of appellant's subsequent inculpatory admissions. Id. at 462.

In Commonwealth v. Redmond, 264 Va. 321, 330, 568 S.E.2d 695, 700 (2002) (plurality opinion), our Supreme Court found that the defendant's questions during the custodial interrogation, "Can I speak to my lawyer? I can't even talk to [a] lawyer before I make any kinds of comments or anything?," did not constitute "a clear and unambiguous assertion of his right to counsel." In reaching that decision, the Court applied the "substantive principles articulated by the [United States] Supreme Court" in Davis, as well as its own precedent, about which it stated as follows:

> Prior to the Supreme Court's decision in Davis, this Court consistently held that a clear and unambiguous assertion of the

right to counsel is necessary to invoke the rule [requiring the police to cease an interrogation when the accused requests counsel].  See Mueller v. Commonwealth, 244 Va. 386, 396, 422 S.E.2d 380, 387 (1992) (defendant's question "Do you think I need an attorney here?" not a clear assertion of right to counsel), cert. denied, 507 U.S. 1043 (1993); Eaton v. Commonwealth, 240 Va. 236, 250, 252-54, 397 S.E.2d 385, 393, 395-96 (1990) (defendant's question "You did say I could have an attorney if I wanted one?" not a clear assertion of right to an attorney), cert. denied, 502 U.S. 824 (1991); Poyner v. Commonwealth, 229 Va. 401, 410, 329 S.E.2d 815, 823 (defendant's question "Didn't you say I have the right to an attorney?" not a clear assertion of right to counsel), cert. denied, 474 U.S. 865 (1985).  And, this Court applied Davis in Midkiff v. Commonwealth, 250 Va. 262, 266-67, 462 S.E.2d 112, 115 (1995) (defendant's statement "I'll be honest with you, I'm scared to say anything without talking to a lawyer" not a clear assertion of right to counsel).

Id. at 329-30, 568 S.E.2d at 699-700.  Holding that "a reasonable police officer . . . would have concluded that the defendant did not invoke his right to counsel during the custodial interrogation," the Supreme Court upheld the trial court's denial of the defendant's motion to suppress the confession he made during the interrogation.  Id. at 330, 568 S.E.2d at 700.

Here, the facts pertinent to the third purported request for counsel are undisputed. Approximately an hour after waiving his Miranda rights, Hilliard asked the detectives conducting the interrogation, "Can I get a lawyer in here?"  The following exchange then took place:

> DETECTIVE WHITE:  Do you want to do that?
>
> HILLIARD:  I already have a lawyer.  I mean, I can talk to you, don't get me wrong.  But I just want to make sure I don't, like I said before, just jam myself up.  And I'll tell you everything that I know. This is my word.
>
> DETECTIVE WHITE:  Okay.  That's fine.
>
> DETECTIVE KOCHELL:  That's fine.
>
> HILLIARD:  I'm not saying that I will say anything other or just because he's in here.  I just want to, you know, make sure I have . . . I'd feel a little bit more comfortable.

DETECTIVE KOCHELL: That's not a problem. We tried to provide you with a comfortable atmosphere here. And, like I said, it's not the stuff that you see on TV dealing with Sipowicz, where he takes a guy and throws him up on the wall. That's not what we're about.

HILLIARD: I will say, I will go as far as to say this. Probably what you all got in that book ain't nowhere near.

DETECTIVE WHITE: Talking about what?

HILLIARD: I'm just saying, what you all probably have in that book, I doubt that it's anywhere near it.

DETECTIVE WHITE: Anywhere near . . . of what we know of why it happened?

HILLIARD: Yeah.

DETECTIVE WHITE: Well, that's why we want to hear from you, because we know there's a bigger picture there. Okay? You know what the problem is, Curtis, is that you got caught up in it.

HILLIARD: Yeah, I did. I was there. I'm going to just say that, I was there. But before I say anything else, I mean, I already talked to you before we go to court.

I do not believe that a reasonable police officer in these circumstances would have understood Hilliard's question, "Can I get a lawyer in here?," to be an unequivocal request for an attorney within the meaning of Davis or Redmond. Certainly, Hilliard's question is no less equivocal than his first two purported requests for counsel or the defendant's question in Redmond, "Can I speak to my lawyer?" At best, "a reasonable officer in light of the circumstances would have understood only that [Hilliard] *might* be invoking the right to counsel." Davis, 512 U.S. at 459. Likewise, Hilliard's statements and actions in response to the detective's follow-up clarifying question, "Do you want to do that?," were equivocal. Instead of directly answering the detective's question in the affirmative, Hilliard again merely "express[ed] his reservation about the wisdom of continuing the interrogation without consulting a lawyer" and continued talking to the detectives in a manner that did "not clearly and unambiguously

communicate a desire to invoke his right to counsel." Midkiff, 250 Va. at 267, 462 S.E.2d at 115.

Thus, under these circumstances, a reasonable police officer would not have necessarily

understood Hilliard to be making an unequivocal request for an attorney. Consequently, because

"the *likelihood* that a suspect would wish counsel to be present is not the test for applicability of

[the rule requiring cessation of the interrogation if the suspect requests counsel]," McNeil v.

Wisconsin, 501 U.S. 171, 178 (1991), Hilliard's reference to a lawyer, like those of the

defendants in Davis and Redmond, "fell short of requesting counsel in a clear and unambiguous

manner," Midkiff, 250 Va. at 267, 462 S.E.2d at 115.

I conclude, therefore, that Hilliard's third purported request for an attorney did not constitute

a clear, unambiguous, and unequivocal invocation of the Miranda right to counsel requiring the

cessation of the interrogation and the suppression of Hilliard's subsequent inculpatory statements.

Accordingly, I would hold that the trial court did not err in denying Hilliard's motion to suppress his

admission that he was at the scene of the crime.

## II.  ALLEN CHARGE

Hilliard further contends, on appeal, that the trial court's comments to the jury after

receiving notification from the jury during its deliberations in the guilt phase of the trial that it was

"split 10-2" and could not "reach a unanimous decision" were improper. The court's comments,

Hilliard argues, "suggested that the jury would be kept until unanimity was reached" and amounted

to a coercive Allen[4] charge that, in effect, instructed the two jurors in the minority to change their

votes.

---

[4] "The so-called 'Allen charge' is based upon the United States Supreme Court decision in Allen v. United States, 164 U.S. 492 (1896). The Virginia Supreme Court has approved use of the 'Allen' instruction." Gardner v. Commonwealth, 3 Va. App. 418, 419 n.1, 350 S.E.2d 229, 229 n.1 (1986) (citing Poindexter v. Commonwealth, 213 Va. 212, 215, 191 S.E.2d 200, 203 (1972)).

The Commonwealth contends that Rule 5A:18 bars this Court's consideration of this issue, because Hilliard made no contemporaneous objection to the judge's remarks. I agree with the Commonwealth.

In applying Rule 5A:18, this Court has held that,

> [w]here an accused alleges that the trial court has made improper remarks in the presence of the jury but fails contemporaneously to object, request a cautionary instruction or move for a mistrial, he waives the right to challenge those remarks on appeal. "A motion for a mistrial is untimely and properly refused when it is made after the jury has retired."

Humbert v. Commonwealth, 29 Va. App. 783, 791, 514 S.E.2d 804, 808 (1999) (citations omitted) (quoting Cheng v. Commonwealth, 240 Va. 26, 39, 393 S.E.2d 599, 606 (1990)).

In this case, Hilliard made no contemporaneous objection to the trial court's remarks. While he initially objected to the giving of an Allen charge, once the trial court stated its intentions and gave its remarks, Hilliard did not contemporaneously object. Indeed, he did nothing before the jury retired to apprise the trial court that the remarks were erroneous or improper in any way. He neither requested a cautionary instruction nor moved for a mistrial. It was not until sentencing, several weeks later, that he moved to have the verdict set aside. The issue, therefore, was not properly preserved.

Moreover, my review of the record in this case does not reveal any reason to invoke the "good cause" or "ends of justice" exceptions to Rule 5A:18. Consequently, I would hold that this claim of error is procedurally barred.

### III. SENTENCING INSTRUCTION

Hilliard also contends, on appeal, that the trial court failed to properly instruct the jury that multiple sentences are presumptively consecutive. He also contends the trial court failed to properly instruct the jury on the possibility of parole, specifically the singular circumstance of geriatric release.

The Commonwealth contends that Rule 5A:18 likewise bars this Court's consideration of these issues, because Hilliard did not object to the instruction the trial court gave in response to the jury's questions concerning parole and the concurrency of the sentences. Again, I agree with the Commonwealth.

Although Hilliard initially asked the trial court to answer the jury's questions by instructing the jury that multiple sentences are presumptively consecutive, he made no contemporaneous objection to the trial court's reasoning and ruling to the contrary or to the court's instruction in response to the jury's question regarding the concurrency of the sentences. Likewise, Hilliard made no contemporaneous objection to the court's instruction with respect to the issue of parole. Hilliard's failure to properly preserve these issues precludes this Court from considering his "challenges to jury instructions raised for the first time on appeal." Commonwealth v. Jerman, 263 Va. 88, 93-94, 556 S.E.2d 754, 757-58 (2002) (holding that defendant "was required to state any objection to the circuit court's instruction and to ask the court for any other instruction on the subject that he deemed necessary" and his failure to timely do so "bars his present challenge to that instruction"); see also Cherrix v. Commonwealth, 257 Va. 292, 311, 513 S.E.2d 642, 654 (1999) (holding that defendant's "failure to proffer a parole eligibility instruction and his failure to object to the trial court's instruction in response to the jury's inquiry . . . precludes us from addressing the merits of this assignment of error"); Rule 5A:18. Hence, finding no reason to invoke the "good cause" or "ends of justice" exceptions to Rule 5A:18, I would hold that this claim of error is also procedurally barred.

### IV. CONCLUSION

For these reasons, I would affirm Hilliard's convictions.

Tuesday                    10th

February, 2004.


Curtis Darnell Hilliard,                                        Appellant,

 against            Record No. 0394-02-2
                   Circuit Court Nos. CR99F-3301 through CR99F-3304

Commonwealth of Virginia,                                       Appellee.


Upon a Petition for Rehearing En Banc

Before Chief Judge Fitzpatrick, Judges Benton, Elder, Annunziata, Bumgardner,
Frank, Humphreys, Clements, Felton and Kelsey


On January 20, 2004 came the appellant, by counsel, and filed a petition praying that the Court

set aside the judgment rendered herein on January 6, 2004, and grant a rehearing *en banc* thereof.

On consideration whereof, the petition for rehearing *en banc* is granted, the mandate entered

herein on January 6, 2004 is stayed pending the decision of the Court *en banc*, and the appeal is

reinstated on the docket of this Court.

The parties shall file briefs in compliance with Rule 5A:35. The appellant shall attach as an

addendum to the opening brief upon rehearing *en banc* a copy of the opinion previously rendered by the

Court in this matter. It is further ordered that the appellant shall file with the clerk of this Court twelve

additional copies of the appendix previously filed in this case.

A Copy,

Teste:

Cynthia L. McCoy, Clerk

By:

Deputy Clerk

COURT OF APPEALS OF VIRGINIA


Present:   Judges Benton, Clements and Senior Judge Willis
Argued at Richmond, Virginia


CURTIS DARNELL HILLIARD

                                                  MEMORANDUM OPINION* BY
v.        Record No. 0394-02-2          JUDGE JEAN HARRISON CLEMENTS
                                                       JANUARY 6, 2004
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                          Thomas N. Nance, Judge

            Steven D. Benjamin (Betty Layne DesPortes; Benjamin &
            DesPortes, P.C., on briefs), for appellant.

            Steven A. Witmer, Assistant Attorney General (Jerry W. Kilgore,
            Attorney General, on brief), for appellee.


        Curtis Darnell Hilliard was convicted in a jury trial of murder, in violation of Code

§ 18.2-32, use of a firearm in the commission of murder, in violation of Code § 18.2-53.1,

maliciously shooting into an occupied vehicle, in violation of Code § 18.2-154, and discharging a

firearm on or within 1000 feet of school property, in violation of Code § 18.2-280(B).  On appeal,

he contends the trial court erred (1) in denying his motion to suppress the inculpatory statements

illegally obtained from him by the police after he had invoked his right to an attorney; (2) in giving

a coercive Allen charge to the jury during the guilt phase of the trial; and (3) in failing to properly

respond to questions from the jury during the sentencing phase of the trial on the presumption of

consecutive sentences and the possibility of geriatric release.  For the reasons that follow, we affirm

the convictions.


_____

        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

As the parties are fully conversant with the record in this case and because this memorandum opinion carries no precedential value, this opinion recites only those facts and incidents of the proceedings as are necessary to the parties' understanding of the disposition of this appeal.

## I. MOTION TO SUPPRESS

On appeal from a trial court's denial of a motion to suppress, the burden is on the appellant to show that the denial of the motion constituted reversible error. See Fore v. Commonwealth, 220 Va. 1007, 1010, 265 S.E.2d 729, 731 (1980). In reviewing such a denial, we consider the evidence in the light most favorable to the Commonwealth, granting to the Commonwealth all reasonable inferences fairly deducible from the evidence. E.g., Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991).

Here, the facts pertinent to the motion to suppress are undisputed. On July 7, 1999, the victim, Anthony Robinson, Jr., was shot and killed in Richmond, Virginia. Hilliard was indicted for Robinson's murder on September 13, 1999, and arrested on September 15, 1999. Richmond City Police Detectives White and Kochell interviewed him the next day. The videotape of that interview was the sole evidence presented at the suppression hearing.

The videotape reveals that, at the beginning of the interview, Detective Kochell advised Hilliard of his rights under Miranda v. Arizona, 384 U.S. 436, 469-73 (1966), and asked him to sign a waiver form indicating he understood his rights and wished to speak to the detectives. Before signing the form, Hilliard asked the detectives, "Can I have somebody else present too, I mean just for my safety, like a lawyer, like y'all just said, or something?" Detective White responded, "That's up to you. Like [Detective Kochell] said, all we're doing today is just trying to get your side of the story. That's all we're trying to do." Hilliard replied, "But I'm trying to tell you, I don't have a side. I don't." Detective White then explained to Hilliard that they could not continue to speak with

him unless he signed the form. Hilliard then signed the waiver form, and the detectives continued the interview.

A few minutes later, after being asked how he knew the victim and being told by the detectives to be honest, Hilliard stated:

> I understand what both of you all are saying wholeheartedly. I need to say that . . . I'm not saying that I know anything. I'm not saying that I know the person. You know what I'm saying? The only thing, . . . like I said, I would like to have somebody else in here because I may say something I don't even know what I am saying, and it might fuck me up, might jam me up in some incidents, and I don't want that to happen, man.

Detective Kochell replied, "We're not here trying to jam you up. Okay?" Kochell then explained to Hilliard that the interview was not going to be conducted in the harsh manner that such interviews were often depicted on television. Hilliard then continued his conversation with the detectives.

Approximately an hour into the interview, Detective White told Hilliard he wanted to know "what happened and why" and wanted Hilliard to tell his "side of the story." The following exchange then occurred:

> HILLIARD: Can I get a lawyer in here?
>
> DETECTIVE WHITE: Do you want to do that?
>
> HILLIARD: I already have a lawyer. I mean, I can talk to you, don't get me wrong. But I just want to make sure I don't, like I said before, just jam myself up. And I'll tell you everything that I know. This is my word.
>
> DETECTIVE WHITE: Okay. That's fine.
>
> DETECTIVE KOCHELL: That's fine.
>
> HILLIARD: I'm not saying that I will say anything other or just because he's in here. I just want to, you know, make sure I have . . . I'd feel a little bit more comfortable.

DETECTIVE KOCHELL: That's not a problem. We tried to provide you with a comfortable atmosphere here. And, like I said, it's not the stuff that you see on TV dealing with Sipowicz, where he takes a guy and throws him up on the wall. That's not what we're about.

HILLIARD: I will say, I will go as far as to say this. Probably what you all got in that book ain't nowhere near.

DETECTIVE WHITE: Talking about what?

HILLIARD: I'm just saying, what you all probably have in that book, I doubt that it's anywhere near it.

DETECTIVE WHITE: Anywhere near . . . of what we know of why it happened?

HILLIARD: Yeah.

DETECTIVE WHITE: Well, that's why we want to hear from you, because we know there's a bigger picture there. Okay? You know what the problem is, Curtis, is that you got caught up in it.

HILLIARD: Yeah, I did. I was there. I'm going to just say that, I was there. But before I say anything else, I mean, I already talked to you before we go to court.

Shortly later, Detective White told Hilliard:

And like you said, we've got plenty of time to sit down and talk like this again with your attorney here, okay, because that's what you've expressed. And you've told us that you were there and there's a bigger picture that you'd like to go over it with your attorney and then explain it to us, okay, and that's where we'll leave it.

The interview ended a few minutes later.

At the suppression hearing, Hilliard argued that he made three requests for the assistance of an attorney, but the police ignored each request and continued the interrogation. The trial court denied the motion to suppress, finding that Hilliard's questions and statements referencing an attorney were "equivocated" and that, "even if he invoked his right to a lawyer immediately prior to the statement," Hilliard's admission that he was at the scene of the crime "was purely voluntary, was not as the result of any continuing interrogation or response to a question."

On appeal, Hilliard contends, as he did below, that he made three requests for the assistance of an attorney during his interrogation by police. He argues that his clear invocation of his Fifth Amendment right to counsel mandated the immediate end of police questioning and the suppression of incriminating statements he thereafter gave to police.[1] We disagree with Hilliard's premise.

An accused who is "subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning." Davis v. United States, 512 U.S. 452, 457 (1994) (citing Miranda, 384 U.S. at 469-73). Moreover, "the police must explain this right to [the accused] before questioning begins." Id. If the accused "effectively waives his right to counsel after receiving the Miranda warnings, law enforcement officers are free to interrogate him." Id. at 458. However, if the accused "requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." Id.

"[T]he test for determining whether the accused invoked the right to counsel is an objective one." McDaniel v. Commonwealth, 30 Va. App. 602, 605, 518 S.E.2d 851, 853 (1999) (en banc). "The Court must determine whether the accused 'articulate[d] his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.'" Id. (quoting Davis, 512 U.S. at 459). Only if the

---

[1] Hilliard does not argue on appeal that his incriminating statements were involuntary. Rather, he argues solely that the detectives should have ceased the interrogation because each of his three requests for counsel constituted a clear and unequivocal invocation of his Fifth Amendment right to counsel.

Hilliard also argues on appeal that, because he had already been indicted when the detectives improperly interrogated him, his Sixth Amendment right to counsel was violated as well. Our review of the record reveals, however, that Hilliard did not make this argument to the trial court. Thus, we will not consider it for the first time on appeal. See Ohree v. Commonwealth, 26 Va. App. 299, 308, 494 S.E.2d 484, 488 (1998) (holding that we will not address an issue, even a constitutional claim, raised for the first time on appeal); Rule 5A:18.

accused "clearly request[ed] an attorney" would the interviewing officers be required to stop questioning him. Davis, 512 U.S. at 461.

As the United States Supreme Court explained in Davis:

> Invocation of the Miranda right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." McNeil v. Wisconsin, 501 U.S. [171, 178 (1991)]. But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning.

512 U.S. at 459. The Supreme Court further explained in Davis, that "when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether he actually wants an attorney." Id. at 461. The Court added, however: "But we decline to adopt a rule requiring officers to ask clarifying questions. If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." Id. at 461-62.

The issue of whether an accused "clearly requested an attorney during a custodial interrogation is a mixed question of law and fact." Commonwealth v. Redmond, 264 Va. 321, 326, 568 S.E.2d 695, 697 (2002) (plurality opinion). "'[T]he determination of what [the accused] actually said is a question of fact that we review only for clear error. Whether those words are sufficient to invoke the right to counsel is a legal determination that we review *de novo*.'" Id. at 327, 568 S.E.2d at 698 (quoting United States v. Uribe-Galindo, 990 F.2d 522, 523 (10th Cir. 1993) (citation omitted)).

Moreover, "an accused's subsequent statements are not relevant to the question whether he invoked his right to counsel. A statement either asserts or fails to assert an accused's right to counsel." Id.

In <u>Davis</u>, the suspect, after waiving his right to counsel, was interviewed by investigators regarding his involvement in a murder. During the interview, the suspect stated, "Maybe I should talk to a lawyer." 512 U.S. at 455. The investigators did not stop the interview at that point. <u>Id.</u> The United States Supreme Court held that the suspect's statement "was not a request for counsel." <u>Id.</u> at 462.

In <u>Redmond</u>, the accused, after waiving his <u>Miranda</u> right to counsel, was questioned by the police regarding the circumstances of a murder for which he had been arrested. 264 Va. at 324-25, 568 S.E.2d at 696-97. During the interrogation, the accused asked, "Can I speak to my lawyer? I can't even talk to [a] lawyer before I make any kinds of comments or anything?" <u>Id.</u> at 325, 568 S.E.2d at 697. The officers conducting the interrogation did not discontinue their questioning of the accused at that point. <u>Id.</u> Finding that the accused's questions "were not a clear and unambiguous assertion of his right to counsel," a plurality of the Supreme Court of Virginia held that the accused "failed to make a clear and unambiguous assertion of his right to counsel." <u>Id.</u> at 330, 568 S.E.2d at 700. In reaching that decision, the plurality of the Court applied the "substantive principles articulated by the [United States] Supreme Court," as well as its own precedent, about which it stated as follows:

> Prior to the Supreme Court's decision in <u>Davis</u>, this Court consistently held that a clear and unambiguous assertion of the right to counsel is necessary to invoke the rule [requiring the police to cease an interrogation when the accused requests counsel]. <u>See</u> <u>Mueller v. Commonwealth</u>, 244 Va. 386, 396, 422 S.E.2d 380, 387 (1992) (defendant's question "Do you think I need an attorney here?" not a clear assertion of right to counsel), <u>cert. denied</u>, 507 U.S. 1043 (1993); <u>Eaton v. Commonwealth</u>, 240 Va. 236, 250, 252-54, 397 S.E.2d 385, 393, 395-96 (1990) (defendant's question "You did say I could have an attorney if I wanted one?" not a clear assertion of right to an attorney), <u>cert. denied</u>, 502 U.S. 824 (1991); <u>Poyner v. Commonwealth</u>, 229 Va. 401, 410, 329 S.E.2d 815, 823 (defendant's question "Didn't you say I have the right to an attorney?" not a clear assertion of right to counsel), <u>cert. denied</u>, 474 U.S. 865 (1985). And, this Court applied <u>Davis</u> in <u>Midkiff v. Commonwealth</u>, 250 Va. 262, 266-67, 462 S.E.2d 112, 115 (1995)

(defendant's statement "I'll be honest with you, I'm scared to say anything without talking to a lawyer" not a clear assertion of right to counsel).

Redmond, 264 Va. at 329-30, 568 S.E.2d at 699-700.

In McDaniel, by contrast, we held that the accused's response after being advised of his Miranda rights, "I think I would rather have an attorney here to speak for me," was an unequivocal request for counsel. 30 Va. App. at 606, 518 S.E.2d at 853. We found that the accused "made his choice clear, informing the detective that he desired to have an attorney speak for him." Id.

Applying these cases and the principles stated therein to the facts and circumstances of this case, we conclude that Hilliard did not clearly request an attorney during the custodial interrogation because none of his questions and statements referencing an attorney constituted an unequivocal invocation of his right to counsel.

In the first instance, after being advised of his Miranda rights, Hilliard asked, "Can I have somebody else present too, I mean just for my safety, like a lawyer, like you all just said, or something?" Uncertain about Hilliard's response, one of the detectives replied, "That's up to you." When told by the detectives that they could not talk to him unless he signed the waiver form, Hilliard signed the form, agreeing to speak to the detectives without a lawyer being present. Thus, Hilliard's question was, at most, an inquiry designed to elicit clarification from the detectives regarding the rights he had just been read, not an unequivocal request for an attorney. See Redmond, 264 Va. at 330, 568 S.E.2d at 700 (noting that the accused's questions, "Can I speak to my lawyer? I can't even talk to [a] lawyer before I make any kinds of comments or anything?" may, at best, "be construed as a desire on his part to obtain more information about his Miranda rights," rather than as a clear request for counsel).

- 39 -

Soon thereafter, Hilliard stated, "[L]ike I said, I would like to have *somebody else* in here because I may say something I don't even know what I am saying, and it might . . . jam me up . . . ." (Emphasis added.) Although Hilliard's statement "expresses his reservation about the wisdom of continuing the interrogation without" someone there to assist him, "it does not clearly and unambiguously communicate a desire to invoke his right to counsel." Midkiff, 250 Va. at 267, 462 S.E.2d at 115. Thus, it was not a clear request for counsel.

Approximately an hour later, Hilliard asked, "Can I get a lawyer in here?" Concerned that Hilliard's question might be a request for an attorney, one of the detectives sought clarification, asking, "Do you want to do that?" Instead of answering the question, however, Hilliard stated, "I already have a lawyer," and again expressed his concern about "jam[ming] [him]self up," adding that he would "feel a little bit more comfortable" with the interview. When the detectives told Hilliard they had tried to make the circumstances comfortable, Hilliard answered that they probably had the facts wrong and acknowledged that he was at the scene of the crime.

As was the case with Hilliard's first question referencing a lawyer, his question, "Can I get a lawyer in here?" was also not an unequivocal request for an attorney. See Redmond, 264 Va. at 330, 568 S.E.2d at 700. Likewise, his subsequent responses to the detective's clarifying question did not unambiguously indicate that he wanted a lawyer present and that he did not wish to continue the interrogation without one. Indeed, to the contrary, Hilliard continued talking to the detectives even though they were not questioning him.

We hold, therefore, "that a reasonable police officer, in light of the circumstances surrounding [Hilliard's statements and] questions [referencing an attorney], would have concluded that [Hilliard] did not invoke his right to counsel during the custodial interrogation." Id. Accordingly, the trial court did not err in not suppressing Hilliard's admission that he was at the scene of the crime.

- 40 -

## II. ALLEN CHARGE

On February 29, 2000, during deliberations at the end of the first day of the trial, the jury foreperson sent a note to the trial judge saying, "We are split 10-2.  We can't reach a unanimous decision."  The trial judge released the jurors until the following day and told the attorneys to "decide in the meantime if you want me to give them the Allen charge."

The next morning, the trial judge asked the attorneys, "Have you all discussed whether or not you want to give them the Allen charge or just continue?"  Hilliard's attorney told the trial judge he did not want the court to give the Allen charge.  The trial judge responded, "I will just tell them to start again, reread the evidence, don't speculate; go over the evidence and talk to each other."  Neither party objected to the trial court's suggestion.  Thereafter, the jury returned to the courtroom and the trial judge made the following remarks to the jury:

> Good morning.  Seems like we just left.  You know, we all know what kind of job you all are assigned here, and it's a very difficult thing.  We can't go out and get twelve better people to do this job than you all; you can do this job.  You have a duty to listen to each other and you have a duty to follow the law and not speculate.  But what I want you to do is to go back, try to start fresh with the instructions, take your time, go through these things and the facts and talk to each other about it.  You can reach a decision in this case.  So you all go back and take your time.  I think they will get you some coffee and if you need a Coke or something -- whatever you need, let them know; they will be glad to accommodate you.  Thank you.  Continue your deliberations.

Hilliard made no objection to the trial court's remarks.

Thereafter, at sentencing on April 21, 2000, Hilliard made a motion to set aside the verdict, arguing that, although the trial court's statement to the jury was "not the same as the Allen charge, . . . it [was] very similar, and that this comment by the Court improperly interfered with the jury's deliberation."  The trial court denied the motion.

On appeal, Hilliard contends the trial court's comments "suggested that the jury would be kept until unanimity was reached" and amounted to a coercive Allen charge that, in effect,

instructed the two jurors in the minority to change their votes. Thus, Hilliard concludes, the comments were improper.

The Commonwealth contends that Rule 5A:18 bars our consideration of this issue because Hilliard made no contemporaneous objection to the judge's remarks. We agree with the Commonwealth.

In applying Rule 5A:18, we have held that,

> [w]here an accused alleges that the trial court has made improper remarks in the presence of the jury but fails contemporaneously to object, request a cautionary instruction or move for a mistrial, he waives the right to challenge those remarks on appeal. "A motion for a mistrial is untimely and properly refused when it is made after the jury has retired."

Humbert v. Commonwealth, 29 Va. App. 783, 791, 514 S.E.2d 804, 808 (1999) (citations omitted) (quoting Cheng v. Commonwealth, 240 Va. 26, 39, 393 S.E.2d 599, 606 (1990)).

In this case, Hilliard made no contemporaneous objection to the trial court's remarks. While he initially objected to the giving of an Allen charge, once the trial court stated its intentions and gave its remarks, Hilliard did not contemporaneously object. Indeed, he did nothing before the jury retired to apprise the trial court that the remarks were erroneous or improper in any way. He neither requested a cautionary instruction nor moved for a mistrial. It was not until sentencing, several weeks later, that he moved to have the verdict set aside. The issue, therefore, was not properly preserved.

Consequently, this claim is procedurally barred. Moreover, our review of the record in this case does not reveal any reason to invoke the "good cause" or "ends of justice" exceptions to Rule 5A:18.

### III. SENTENCING INSTRUCTION

After the jury returned verdicts of guilty, the trial court prepared to instruct the jury with respect to sentencing. The trial court asked Hilliard, "Do you want anything about parole in

Virginia or not?" Initially, Hilliard's attorney stated, "I think you should say there is no parole." However, after further discussion with the trial judge and consultation with Hilliard, Hilliard's attorney decided not to ask for an instruction regarding parole.

During deliberations, the jury submitted three written questions to the trial court:

1. Do the sentences run concurrently?

2. Will he get credit for times served?

3. When will he be eligible for parole?

In the ensuing discussion about how to respond to the jury's questions, Hilliard's attorney asked the trial court to tell the jury that "there is no parole" and that the sentences would "run consecutively." The trial court responded: "It may not run consecutive. It could run concurrent. That's not for them to decide and credit for time served. I don't mind telling them he gets credit for time served. I don't mind telling them as far as they're concerned, there is personally no parole." Hilliard made no objection to the court's decision. Instead, his attorney solely asked, "Just the parole issue?" to which the trial court responded, "All right. Bring [the jury] back."

Before the jury returned, however, the Commonwealth sought further clarification of how the trial court was intending to respond to the jury's questions. In reply to the Commonwealth's query, the trial court stated:

> Well, they say when will he be eligible for parole and that
> sort of bothers me because he may be eligible when he's seventy or
> when he's sixty, or whatever it is, and then you get into that's not a
> true -- as far as a jury is concerned, there is no parole in Virginia.
> But in this situation, they want to know when he will be eligible.

The Commonwealth then asked the trial court not to answer the parole question. Hilliard's attorney again asked that the jury be told "that there is no parole." The trial court then instructed the jury as follows:

> Ms. Bowles I got your question and I have talked it over with
> the lawyers and pretty generally, it's -- I am to explain to you that

> your function at this time is to listen, take the evidence and the law and what you've heard and decide on a proper punishment in each of these cases. That's what you do. You're not to concern yourself with what may happen afterward. You set an appropriate punishment in each of these cases. That's your job. I will tell you that other than some exceptional circumstances, parole in Virginia was abolished several years ago and that's all I'm allowed to tell you.

Hilliard did not object to the instruction given.

On appeal, Hilliard argues the trial court failed to properly instruct the jury that multiple sentences are presumptively consecutive. He also argues that the trial court failed to properly instruct the jury on the possibility of parole, specifically the singular circumstance of geriatric release.

The Commonwealth argues that Hilliard's claims are procedurally barred under Rule 5A:18 because he did not object to the instruction the trial court gave in response to the jury's questions concerning parole and the concurrency of the sentences. Again we agree with the Commonwealth.

Although Hilliard initially asked the trial court to answer the jury's questions by instructing the jury that multiple sentences are presumptively consecutive, he made no contemporaneous objection to the trial court's reasoning and ruling to the contrary or to the court's instruction in response to the jury's question regarding the concurrency of the sentences. Likewise, Hilliard made no contemporaneous objection to the court's instruction with respect to the issue of parole. Thus, we will not consider these "challenges to jury instructions raised for the first time on appeal." Commonwealth v. Jerman, 263 Va. 88, 93-94, 556 S.E.2d 754, 757-58 (2002) (holding that defendant "was required to state any objection to the circuit court's instruction and to ask the court for any other instruction on the subject that he deemed necessary" and his failure to timely do so "bars his present challenge to that instruction"); see also Cherrix v. Commonwealth, 257 Va. 292, 311, 513 S.E.2d 642, 654 (1999) (holding that defendant's "failure

to proffer a parole eligibility instruction and his failure to object to the trial court's instruction in response to the jury's inquiry . . . precludes us from addressing the merits of this assignment of error"); Rule 5A:18.

Accordingly, we affirm Hilliard's convictions.

Affirmed.

Benton, J., dissenting.

Under the standard announced by the Supreme Court, Curtis Darnell Hilliard asserted his Fifth Amendment right to counsel.

> [C]ourts [are required] to "determine whether the accused actually invoked his right to counsel." To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry. Invocation of the <u>Miranda</u> right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning.
>
> Rather, the suspect must unambiguously request counsel. As we have observed, "a statement either is such an assertion of the right to counsel or it is not." Although a suspect need not "speak with the discrimination of an Oxford don," he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.

<u>Davis v. United States</u>, 512 U.S. 452, 458-59 (1994) (citations omitted).

The detectives began the interrogation by telling Hilliard they were there to "get some things straight" and to "hear what [Hilliard] had to say." After a detective told Hilliard he had to read a form to him that must be read to every person before an interview, he read the <u>Miranda</u> warnings to Hilliard. He asked Hilliard to sign the form acknowledging that the warnings were read to him and then sign again indicating the detectives could talk to him. Before Hilliard signed the form, he made the first of three requests for a lawyer. Hilliard said, "Can I have somebody else present too, I mean just for my safety, like a lawyer like y'all just said?" One of the detectives responded that they were just trying to get his side of the story and said they could talk after he signed the form. When Hilliard signed the form, the detectives continued the

interrogation. Hilliard then said, "Like I said, I would like to have somebody else in here." The interrogation continued.

During lengthy dialogues, the detectives told Hilliard that more than two people identified him as the killer and said they had sufficient evidence to convict him but wanted to know his side of the story. Hilliard denied being involved in the killing. As the detectives showed him a diagram of the location of the murder and continued to interrogate him, Hilliard said, "Can I get a lawyer in here?" Although Hilliard expressed discomfort with continuing the interrogation without assistance, the detectives failed to honor his requests.

Hilliard's statements were "appropriate response[s] to the warnings, which gave [him] the choice of speaking with the detective without an attorney or having an attorney present while the detective questioned him." McDaniel v. Commonwealth, 30 Va. App. 602, 606, 518 S.E.2d 851, 853 (1999). To deny that Hilliard's "'statement[s] . . . can reasonably be construed to be an expression of a desire for the assistance of an attorney,'" Davis, 512 U.S. at 459, is to disadvantage Hilliard because of his lack of linguistic skills and to impose upon him the very requirement that the Supreme Court has expressly rejected -- that he "need not 'speak with the discrimination of an Oxford don.'" Id. at 459 (citation omitted).

For these reasons, I would hold that the trial judge erred in denying the motion to suppress the statement and I would reverse the convictions and remand for a new trial.